**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

NATALIE PRECIADO,

      **Plaintiff,**

v.                                       **No. 19-cv-0184 SMV/KRS**

BOARD OF EDUCATION OF
CLOVIS MUNICIPAL SCHOOLS,

      **Defendant.**

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S AMENDED BRIEF IN CHIEF

THIS MATTER is before the Court on the Amended Brief in Chief[1] filed by Defendant Board of Education of Clovis Municipal Schools ("the District") on September 6, 2019. [Doc. 26].[2] Plaintiff Natalie Preciado ("Parent") responded on September 13, 2019. [Doc. 27]. The District replied on October 15, 2019. [Doc. 31]. The Court held oral argument on February 26, 2020. [Doc. 37] (clerk's minutes). The parties consented to have the undersigned conduct dispositive proceedings and enter final judgment in this matter. [Doc. 14]. The Court has considered the briefing, the relevant portions of the record, the relevant law, and the oral argument. Being otherwise fully advised in the premises, the Court finds that the Amended Brief

---

[1] The District filed a Brief in Chief on August 16, 2019, [Doc. 21], then filed its Amended Brief in Chief on September 6, 2019, [Doc. 26]. According to the District, the "only amendment to the . . . Brief in Chief [Doc. 21] is the addition of citations to the complete Record Proper." *Id.* at 1 n.1. Thus, for simplicity's sake, the Court will cite only to the Amended Brief in Chief [Doc. 26]. Moreover, because the District uses the Amended Brief in Chief to request relief—that the Court reverse the Due Process Hearing Officer's decision—the Court construes it as a motion. *See Boutelle v. Bd. of Educ. of Las Cruces Pub. Schs.*, No. 17-cv-1232 GJF/SMV, 2019 WL 2061086, at *1 n.2 (D.N.M. May 9, 2019).

[2] Parent and the District filed separate actions based on the administrative proceedings below, and the Court consolidated the two cases on June 28, 2019. *See* [Doc. 16]. When the Court cites to ECF documents, it cites to those documents filed in the consolidated case, No. 19-cv-0184 SMV/KRS.

in Chief is not well taken and will AFFIRM the Due Process Hearing Officer's Memorandum Decision and Order.

## BACKGROUND

Student is a sixth grader at Arts Academy at Bella Vista in Clovis, New Mexico. *See* [Doc. 22] at 2. Since second grade, she has had a specific learning disability in reading and written language. *See* Tr. 0303. It is suspected that Student has dyslexia. Tr. 0334. In second, third, fourth, and fifth grade, the District has, together with Parent, prepared an individualized education program ("IEP") for each school year, outlining the academic progress that Student has made and the District's goals for helping Student achieve appropriate progress for the next year. *See* Tr. 0455–0530; [Doc. 22] at 2–22.

Student's third-grade IEP (04/08/2016) noted that she had a learning disability in reading. Tr. 0455. The IEP mandated that she receive pull-out services for reading instruction. Tr. 0456. It set as a goal that Student would read a second-grade text at 80% accuracy by the end of the year. Tr. 0463. However, her reading and language skills largely remained at the first-grade level throughout the year. *See* Tr. 1308. Her reading abilities remained a full grade level behind her peers at the end of third grade. Tr. 0476, 0481. Her special-education teacher, Mr. Robert Nora, testified that she never read at grade level in third grade. *See* Tr. 1192, 1243. Mr. Nora taught reading to Student using a program called Read Naturally. Tr. 0304. Student had 21 absences and 49 tardies in third grade. *See* Tr. 0987.

At the beginning of fourth grade, Student's reading scores showed that she was still reading at a first- or second-grade level. Tr. 1503. Student's fourth-grade IEP (04/03/2017) noted that she had a learning disability in reading and written language. Tr. 0475. The IEP

mandated that she receive pull-out services for reading and language instruction. Tr. 0476. It set as a goal that Student would read a 3.5-level[3] text with 80% accuracy by the end of the year. Tr. 0481. The IEP required the District to give Student 300 minutes per week of special-education reading instruction and 150 minutes per week of special-education writing instruction. Tr. 0493. The IEP specified that this instruction should occur in individual and group settings. *Id.* Mr. Nora taught Student in fourth grade using a combination of Read Naturally and Orton-Gillingham.[4] Tr. 0305. Students taught with the Orton-Gillingham program learn different phonemes[5] and words each day by tapping out the syllables, writing the letters in a sand tray, and pronouncing the letters aloud in drills. *See* Tr. 1268–79. Student's general-education teacher, Ms. Jennifer Bolin, testified that Student could not read grade-level material independently. Tr. 1505. Student had at least 34 absences and 55 tardies during fourth grade. *See* Tr. 0987.

Student's fifth-grade IEP (03/26/2018), completed in the spring of her fourth-grade year, noted that she had a learning disability in reading and written language. Tr. 0510. It recommended that the District increase her reading and writing skills while noting that such goals may prove difficult to accomplish given her absences. *See* Tr. 0512. The IEP noted that at the end of fourth grade, Student was reading at a 3.0 level. *See* Tr. 0518. It set as a goal that

---

[3] "3.5-level" refers to the level at which the school would expect a student to read in her third-grade year, fifth month. *See* Tr. 0324. When discussing whether Student has read at her grade level, the Court will use this mechanism to describe the texts that Student would read: [grade year].[month].

[4] Mr. Nora did not teach Student in third grade using Orton-Gillingham because the school did not offer it at the time. Tr. 0304.

[5] Phonemes are the "smallest unit of speech distinguishing one word (or word element) from another, as the element *p* in 'tap,' which separates that word from 'tab,' 'tag,' and 'tan.'" Encyclopædia Britannica, *Phoneme* https://www.britannica.com/topic/phoneme (last visited February 18, 2020). For example, Mr. Nora used Orton-Gillingham to teach Student the "ch" phenome, as in "church." Tr. 1270–73.

Student would read a text at 70% accuracy by the end of fifth grade. *Id.* It also set as a goal that Student would write two paragraphs with 70% accuracy by the end of fifth grade. *Id.* The IEP required the District to give Student 300 minutes per week of special-education reading instruction and 150 minutes per week of special-education writing instruction. Tr. 0524. It specified that this instruction should occur in individual and group settings. *Id.*

Student was evaluated on April 11, 2018, to determine her eligibility for special-education services. Tr. 0986–87. As a part of this evaluation, Student took the Kaufman Test of Educational Achievement, a test designed to assess a student's academic achievement in a variety of subjects such as math, reading, and writing. *See* Tr. 0994. Student scored in the "average" range on many areas of reading and writing, such as sound-symbol, decoding,[6] reading comprehension, and written expression. *Id.* She also scored in the "below average" range on other areas of reading and writing, including written language, reading fluency, decoding fluency, and spelling. *Id.* As a result of these and other test scores, the District found that Student "does NOT meet the eligibility requirements for special[-]education services as a student with a Specific Learning Disability." Tr. 0999.

Despite the District's finding, Student read at a 3.1 level at the beginning of fifth grade, requiring "urgent intervention." Tr. 0838. Ms. Jennifer Wines, Student's special-education instructor in fifth grade, testified that Student read at a beginning- or mid-fourth grade level in October of 2018. Tr. 1413–14. Student did not receive the full amount of the specialized

---

[6] Decoding is the reading skill that matches letters and syllables to sounds, then groups those sounds together to form words. Suzanne E. Rowe, *Learning Disabilities and the Americans with Disabilities Act: The Conundrum of Dyslexia and Time*, 15 Legal Writing: J. Legal Writing Inst. 165, 184 n.111 (2009); *see* Tr. 0306.

300 minutes and 150 minutes per week in reading and writing, respectively. *See* Tr. 1445–46, 2114. Student missed at least eight classes in fifth grade. Tr. 2111.

Throughout Student's third- through fifth-grade years, the District relied on a program called Istation to assess Student's reading progress. *See* Tr. 0476, 0511; [Doc. 22] at 4. Istation would assign Student to one of three tiers based on her scores; Tier I is grade level and Tier III is the lowest tier, meaning that a student could not do grade-level work. Tr. 1311. The District relied in part on her Istation scores when formulating the IEPs. *See* Tr. 0336, 0476, 0511.

## PROCEDURAL HISTORY

Parent filed her Request for Due Process Against Local Educational Agency on July 24, 2018, in the summer between fourth and fifth grade. *See* Tr. 0298. The Request alleged that the District violated and continued to violate the Individuals with Disabilities Education Act ("IDEA") in four relevant ways. First, it alleged that the District failed to evaluate Student for use of assistive technology for written work. Tr. 0022. Second, it alleged that the District failed to provide Student with the reading, writing, and spelling instruction needed to meet her individualized needs. Tr. 0022–0024. Third, it alleged that the District failed to have a person in attendance at the IEP meetings who could interpret the meaning of assessments like Istation. *See id.* Fourth, it alleged that the District's IEP goals aimed too low to enable Student to make appropriate progress. Tr. 0023. Nancy L. Simmons, the Due Process Hearing Officers ("DPHO"), held a Due Process Hearing on October 22, 2018 through October 24, 2018. Tr. 0298.

The DPHO issued her Memorandum Decision and Order on February 4, 2019. Tr. 0298, 0347. As relevant here, the DPHO found that the District violated the procedures in the IDEA

by relying on Student's Istation scores in IEP meetings without properly interpreting them for Parent. Tr. 38–40. She then found that the District denied Student a free appropriate public education ("FAPE") under the IDEA by (1) relying on Istation scores to gauge her academic progress, (2) failing to provide Student with proper, specialized instruction in important reading programs like Orton-Gillingham, (3) improperly decreasing the expectations in Student's IEP to make it easier for Student to meet the IEP's goals, and (4) failing to follow the IEP requirements that Student receive 300 minutes in special-education reading instruction and 150 minutes in special-education writing instruction per week. Tr. 0337–42. The DPHO also found that the District failed to provide Student with the proper assistive technology to help her make appropriate progress. Tr. 45–46.

In relevant part, the DPHO awarded the following remedies: (1) the District must maintain Student in special education through at least the conclusion of sixth grade; (2) the District must give Student compensatory education[7] in reading, writing, and spelling in the form of 1/1 time with a licensed special-education teacher trained in Orton-Gillingham or similar programs; (3) Student must receive an independent assistive technology evaluation, including to determine whether she should receive audio books; and (4) the next IEP meeting must be a facilitated IEP, with Parent receiving adequate information to meaningfully participate in it. Tr. 0345–46.

On March 6, 2019, Parent timely filed a complaint in this Court requesting, as the prevailing party in the administrative action, her attorney's fees under the IDEA. *See* [Doc. 1].

---

[7] Compensatory education is an equitable remedy whereby the District gives Student educational services designed to place her in the position she would have been had the District complied with the IDEA. *See Ferren C. v. Sch. Dist. of Phila.*, 612 F.3d 712, 717–18 (3d Cir. 2010).

The District filed a separate action seeking judicial review of the DPHO's decision.  *See* [Doc. 16] at 2.  The Court consolidated the two actions on June 28, 2019.  *Id.*  The District filed its Amended Brief in Chief on September 6, 2019, arguing that the Court should reverse the DPHO's decision.  [Doc. 26].

## LEGAL STANDARD

"The IDEA is a comprehensive statute enacted to ensure that all children with disabilities have access to a 'free appropriate public education designed to meet their unique needs.'"  *Ass'n for Cmty. Living in Colo. v. Romer*, 992 F.2d 1040, 1042–43 (10th Cir. 1993) (quoting 20 U.S.C. § 1400(c) (1988)).  The IDEA defines a FAPE as special education and related services provided at the public's expense that "are provided in conformity with the individualized education program required under [the statute]."  20 U.S.C. § 1401(9) (2015).

"The IEP is a written document that provides the basic plan and goals for the student's education over the academic year."  *Systema ex rel. Systema v. Acad. Sch. Dist. No. 20*, 538 F.3d 1306, 1312 (10th Cir. 2008).  "The IEP is the basic mechanism through which each child's individual goals are achieved"; in essence, it is the means by which a child achieves a FAPE.  *L.B. ex rel. K.B. v. Nebo Sch. Dist.*, 379 F.3d 966, 974 (10th Cir. 2004).  This plan includes, among other items, a statement about the child's current levels of academic achievement, annual goals to allow the child to make academic progress, and a description of how the school will measure the child's progress.  *See* § 1414(d)(1)(A)(i)(I)–(III).  The IEP is developed by a team comprised of the child's parents, a general-education teacher, a special-education teacher, a school representative, and a person to interpret the implications of a student's evaluation.  *Id.*

§ 1414(d)(1)(B). "This collaborative approach places special emphasis on parental involvement." *Systema*, 538 F.3d at 1312.

If the child's parents and the school disagree over the IEP, a party may request a "due process hearing" to resolve the differences. § 1415(f)(1)(A). A DPHO conducts this hearing and makes an administrative finding that the school has or has not denied the student a FAPE. *See id.* § 1415(f)(3)(A), (E). The losing party has the right to bring a civil action challenging the DPHO's decision in federal district court. *Id.* § 1415(i)(2)(A). The prevailing party may bring an action in federal district court requesting its attorney's fees. *Id.* § 1415(i)(3).

"The judicial review of IDEA cases 'differs substantially from judicial review of other agency actions, in which courts generally are confined to the administrative record and are held to a highly deferential standard of review.'" *L.C. v. Utah State Bd. of Educ.*, 188 F. Supp. 2d 1330, 1336 (D. Utah 2002) (quoting *Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1471 (9th Cir. 1993)). A district court must apply a "modified de novo standard when reviewing agency disposition in the IDEA context." *Garcia v. Bd. of Educ. of Albuquerque Pub. Schs.*, 520 F.3d 1116, 1125 (10th Cir. 2008). Under this standard, the district court must "(1) receive the record of the administrative proceedings, (2) hear additional evidence at the request of the party, and (3) base its decision on the preponderance of evidence." *Id.* "[T]hough the statute specifies that review is de novo, the Supreme Court has interpreted the requirement that the district court receive the administrative record to mean that 'due weight'[8] must be given to the administrative

---

[8] Neither the Tenth Circuit nor the Supreme Court has defined "due weight." The district court is not "free to simply adopt the state administrative findings without an independent re-examination of the evidence." *L.C. v. Utah State Bd. of Educ.*, 188 F. Supp. 2d 1330, 1336 (D. Utah 2002). The Eighth Circuit has found that a district court may give a DPHO's decision less weight than under the substantial-evidence test, but a court should nonetheless give consideration "to the fact that the state hearing panel has had the opportunity to observe the demeanor of the

proceedings . . . ." *Id.* (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982)). A DPHO's factual findings "are considered prima facie correct." *L.B.*, 379 F.3d at 974. A district court then independently examines the legal question of whether the school district has complied with the IDEA, basing its decision on a preponderance of the evidence. *Systema*, 538 F.3d at 1311.

When reviewing an IDEA appeal, a district court must undertake a two-part test. First, a court must determine whether the school complied with the IDEA's procedural requirements. *Rowley*, 458 U.S. at 206. Second, a court must determine whether the school substantively provided the student with a FAPE. *Id.* at 207. "If the IEP satisfies both steps, then the school district has complied with the [IDEA]." *Systema*, 538 F.3d at 1312–13.

"To meet its substantive obligations under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017). "[B]ecause the question before us is not whether the IEP will guarantee some educational benefit, but whether it is reasonably calculated to do so, our precedent instructs that 'the measure and adequacy of an IEP can only be determined as of the time it is offered to the student.'" *Thompson R2-J Sch. Dist. v. Luke P. ex rel. Jeff P.*, 540 F.3d 1143, 1149 (10th Cir. 2008) (quoting *O'Toole ex rel. O'Toole v. Olathe Dist. Schs. Unified Sch. Dist. No. 233*, 144 F.3d 692, 701 (10th Cir. 1998)). To that end, an IEP must only be reasonable, not ideal. *Endrew*

witnesses." *Fort Zumwalt Sch. Dist. v. Clynes*, 119 F.3d 607, 610 (8th Cir. 1997). In the Fourth Circuit, if a district court "is not going to follow [the DPHO's factual findings], [it] is required to explain why it does not." *Doyle v. Arlington Cty. Sch. Bd.*, 953 F.2d 100, 105 (4th Cir. 1991).

*F.*, 137 S. Ct. at 992. A district court cannot "substitute [its] own notions of sound educational policy for those of the school authorities which [it] review[s]." *Rowley*, 458 U.S. at 206.

## ANALYSIS

The District challenges the DPHO's rulings on the IDEA's procedural, substantive, and remedial components. First, it argues the DPHO incorrectly found it had violated the IDEA's procedural requirements. [Doc. 26] at 9–11. Second, it argues it did not deny Student a FAPE because she had made progress in reading, writing, and spelling and it provided individualized instruction to her. *See id.* at 11–20. Third, it argues Student's absences, not any deficiency in the District's instruction, caused her progress to suffer. *Id.* at 20–22. Fourth, it contends the DPHO improperly awarded Student compensatory education. *Id.* at 23–25. Fifth, it argues that the DPHO incorrectly ordered it to arrange an independent assistive technology evaluation for Student. *Id.* at 3, 6. Finally, the District requests that the Court allow it to present additional evidence that it did not produce in the administrative proceedings. *Id.* at 3; [Doc. 31] at 12.

The District expressly objects to 23 of the DPHO's factual findings and 26 of the DPHO's conclusions of law. *See* [Doc. 26] at 3. The District objects in a conclusory fashion to each of these findings and conclusions, supporting its objections with neither citation to record evidence nor legal argument. *See id.* The Court therefore overrules each of the District's factual objections and adopts the DPHO's factual findings. The Court deems waived any conclusory objections to the DPHO's legal conclusions unsupported by argument in the briefing.[9]

---

[9] The District filed a document entitled "Supplemental Evidence" on August 16, 2019. [Doc. 22]. Parent objects to its consideration by the Court because the document contains two items not in the record before the DPHO: the IEP created at the end of fifth grade and an Assistive Technology Evaluation conducted in May of 2019. [Doc. 27] at 6 n.2. As discussed below, even upon considering this supplemental evidence, the Court still finds that it should affirm the DPHO's decision. Additionally, contrary to Parent's suggestion, the IDEA contains no requirement that a

**A.** **The DPHO correctly found that the District effectively excluded Parent from parts of the IEP meetings by relying on Istation scores to gauge Student's progress without properly explaining them.**

The Court first determines whether the District committed a procedural violation of the IDEA. *See Rowley*, 458 U.S. at 206. The DPHO found that the District effectively excluded Parent as a member of the IEP team by frequently relying on scores from an assessment tool called Istation in developing the IEP. Tr. 0335–37. The DPHO found that the District could not explain Student's Istation scores to Parent at IEP meetings and that insufficient evidence showed that Istation scores adequately measured academic progress. *Id.* The DPHO concluded that by failing adequately to explain Student's Istation scores to Parent, the District violated the IDEA's requirement that a parent be an important member of the IEP team. *See id.*; *see also Systema*, 538 F.3d at 1312.

The DPHO therefore ordered the District to either forgo reliance on Istation in future IEPs, or to come to IEP meetings ready to explain how Student's Istation results affect her IEP. Tr. 0336. The DPHO also ordered the District to hire a facilitator for future IEP meetings and to pay for an advocate to appear at the meetings on Parent's behalf. Tr. 0337.

The District does not meaningfully contest any of these findings. Rather, it advances two arguments suggesting that the DPHO's findings are improper. First, it seems to argue that Parent had not adequately raised a procedural challenge to the District's provision of Student's IEPs. *See* [Doc. 26] at 10. The argument seems to be that because the DPHO found that no procedural irregularities existed in the disability evaluations of Student outside her IEP, the DPHO could not

---

party wishing to supplement the record file a formal request for an evidentiary hearing. *See* § 1415(i)(2)(C)(ii); *Lopez-Young v. Dist. of Columbia*, 211 F. Supp. 3d 42, 52 (D.D.C. 2016). The Court overrules Parent's objection.

have found that any procedural violations occurred. *See id.* The Court disagrees. Even if Parent did not challenge the procedure by which the District evaluated Student for a disability, Parent still argued that the District's use of Istation scores effectively excluded her from important parts of the IEP meetings. *See* Tr. 0222, 0301.

Second, the District argues that it "addressed [Parent's concerns] in Parent's New Mexico Public Education Department State Complaint . . . resulting in a Mediated Agreement dated March 26, 2018. Any procedural defects were resolved in favor of the School District." [Doc. 26] at 11 (citations omitted); *see* [Doc. 31] at 4. This argument is entirely conclusory; the District fails to explain how the Mediated Agreement resolved any of Parent's concerns or somehow mooted the DPHO's order. The Court therefore rejects it.

For the above reasons, the Court affirms the DPHO's award of equitable relief to remedy the District's failure to properly include Parent as a member of the IEP team.

**B.     The District denied Student a FAPE by failing to adequately develop or follow an IEP reasonably calculated to allow her to make appropriate progress and by failing to give Student adequate specialized instruction.**

Next, the Court must determine whether the District violated the IDEA's substantive provisions. A school need only offer an IEP reasonably calculated to enable a student to make appropriate progress under the circumstances; it need not maximize educational progress, and the Court must evaluate the IEP as of the time the school offered it to the student. *Endrew F.*, 137 S. Ct. at 999; *Thompson R2-J Sch. Dist.*, 540 F.3d at 1149.

Analyzing the case through this lens, the Court must alter the issue presented to it. The parties expend significant resources arguing whether Student has or has not made progress since third grade. *See* [Doc. 26] at 13–17; [Doc. 27] at 17, 20–22. Yet, the issue is not whether

Student has made progress; the Court must determine whether she has made *appropriate* progress under the circumstances. *See Endrew F.*, 137 S. Ct. at 999. Simply arguing that Student has made progress does not answer this fundamental question. Moreover, the Court must evaluate the IEPs at the time the school offered them to Student. *See Thompson R2-J Sch. Dist.*, 540 F.3d at 1149. Thus, if Student failed to make progress in spite of an IEP that was reasonably calculated to enable her to make appropriate progress, the District would not have violated the IDEA. *See id.* Nonetheless, though the Court must "evaluate the adequacy of the [IEP] from the perspective of the time it is written," a school district cannot "ignore the fact that an IEP is clearly failing, nor can it continue to implement year after year, without change, an IEP which fails to confer educational benefits on the student." *O'Toole*, 144 F.3d at 702; *see Thompson R2-J Sch. Dist.*, 540 F.3d at 1153 ("[A student's] past progress is, of course, not dispositive of the controlling question whether, going forward, the December 2003 IEP was reasonably calculated to confer some educational benefit, but it does strongly suggest that, modeled on prior IEPs that had succeeded in generating some progress, the December 2003 IEP was reasonably calculated to continue that trend.").

Neither party articulates what "appropriate progress" should look like in this case. The DPHO found that though the IDEA does not require a school to enable a disabled student to perform at her grade level, the District had not provided a proper explanation for why Student could not read, write, or spell at her grade level if provided with the means to do so. *See* Tr. 0341. Neither party argues that the Court should analyze Student's "appropriate progress" at a level other than her grade level. Though the District objects to the DPHO's Conclusion of Law 51, which found that the District "has presented no cogent and responsive explanation for

13

why Student could not learn to read at the level of her general education peers," Tr. 0341, the District fails to state why the benchmark for Student's appropriate progress should be anything other than her grade level, *see* [Doc. 26] at 3. The Court overrules this objection and adopts the DPHO's finding that no reason exists why, if the District followed a proper IEP, Student could not perform academically at her grade level.

The Court begins by finding that all the IEPs in this case contain extremely similar goals and recommendations for Student. For example, the IEPs for third and fourth grade each recommend that Student receive pull-out services in reading. Tr. 0456; Tr. 0476. Her third- and fourth- grade IEPs also found that Student read significantly below her current grade level and recommended that Student read certain below-grade-level texts at 80% accuracy by the end of her next evaluation. *See* Tr. 0463; Tr. 0481. Her third-grade IEP recommended that she receive 250 minutes of reading per week in a special-education setting, Tr. 0468. Likewise, her fourth grade IEP recommended that she receive 300 minutes of reading per week in a special-education setting, Tr. 0491. Similarly, Student's fifth-grade IEP suggested that she receive continued support for her reading and writing skills, Tr. 0512, but reduced her reading goal to comprehend 70% (not 80%) of the assigned texts, Tr. 0518–19, and recommended that she write two paragraphs with 70% accuracy in organization, grammar, and punctuation, Tr. 0520. Student's fifth-grade IEP also recommended that she receive 300 minutes per week of reading instruction and 150 minutes per week of writing instruction in a special-education setting. Tr. 0524.

Ultimately, the goals and methods for achieving those goals in each IEP largely mirror those of the previous IEP. Thus, if the prior IEPs had generated insufficient academic progress, or if the District failed to follow parts of the IEPs that were reasonably calculated to achieve

appropriate progress, the District did not provide Student with a FAPE. *See Thompson R2-J Sch. Dist.*, 540 F.3d at 1153; *O'Toole*, 144 F.3d at 702. The DPHO found that the District had denied Student a FAPE during fourth grade and part of fifth grade and awarded compensatory education accordingly. Tr. 0344. Therefore, the Court must analyze whether Student's fourth- and fifth-grade IEPs were reasonably calculated to enable her to make appropriate progress.

Before the Court analyzes the District's alleged substantive violation, it must describe the District's arguments on this subject. Most of the District's arguments are conclusory and accompanied by cites spanning hundreds of pages of the record. *See, e.g.*, [Doc. 26] at 13 ("Student's records reflect progress from grade to grade and improved skills in reading and written language . . . ." (citing Tr. 1472–1624, 1965–2116)). The Court will not comb through hundreds of pages to find the snippets of evidence that support the District's position, assuming such evidence exists. The Court has reviewed the pertinent parts of the record and concludes that a preponderance of the evidence shows that the District failed to offer IEPs reasonably calculated to enable Student to make appropriate progress. The Court will discuss this evidence below. To the extent the District believes other evidence suggests the contrary outcome, it has failed to develop those arguments, and the Court deems any such argument waived.

### 1. Third Grade

Mr. Nora taught Student during third and fourth grade. Tr. 0303. In third grade, he primarily taught her reading skills using Read Naturally. Tr. 0304. In Read Naturally, students perform "cold reads" and "hot reads." *Id.* A student performs a cold read of a text by reading a story without having listened to it beforehand, and the teacher grades the student on her performance. *Id.* A student then performs a "hot read" of a text by reading a certain number of

words per minute. *Id.* The teacher grades the hot read not based on how many words she read correctly but on how many words she read per minute. *Id.* The DPHO noted that a student could perform well on the hot read simply by memorizing words rather than decoding them. *See* Tr. 0307–08.

The DPHO found that Mr. Nora's methodology did not adequately teach Student appropriate reading skills. *See* Tr. 0306. Specifically, Mr. Nora conceded that Read Naturally did not teach students how to decode words, *see* Tr. 1252, and he conflated memorization of words with learning to decode, stating that "hopefully" if a student memorizes words during the hot read, then she will learn to decode, *see* Tr. 1251–52. He testified, "I don't know what the cure for dyslexia is, other than hard work and repeated practice." Tr. 1365–66.

Student received exceedingly poor scores in reading during third grade. One test showed that most of her reading and language skills remained at the first-grade level. Tr. 1308. In April of third grade, Student read at a 2.0–2.3 level, approximately a full grade level behind her peers. Tr. 0481; *see* Tr. 0476. Mr. Nora testified that Student "[n]ever read[] at grade level at any of the times [he] taught her." Tr. 1243. Additionally, Student could spell at a 1.0–2.5 level at the end of her third-grade year. *See* Tr. 0485, 1276–77. Despite her IEP's goals, she remained significantly behind her grade level in reading and spelling.

## 2. Fourth Grade

At the beginning of fourth grade, Student's reading scores reflected that she read at a first- or second-grade level. Tr. 1503. Her IEP recommended that by the end of her fourth-grade year, Student should read a 3.5-level text at 80% accuracy—more than an entire grade below her level. *See* Tr. 0481. Student "never got" to that level. Tr. 1299.

16

Mr. Nora remained Student's teacher in fourth grade. Tr. 0303. Fourth grade "was the first school year that special education teachers were offered training in Orton-Gillingham." Tr. 0304. The DPHO found, and the District does not contest, that Student needed Orton-Gillingham or a similar program to learn to read given her specific learning disability. Tr. 0330. Mr. Nora received one week of training on Orton-Gillingham before teaching it. Tr. 0305. Mr. Nora noted the significant differences between Read Naturally and Orton-Gillingham. *See* Tr. 1269 (testifying that when he learned how much Orton-Gillingham differed from Read Naturally, it made his head explode).

The parties agree that Orton-Gillingham constitutes a proper method of teaching Student to read. *See* Tr. 0340. The District does not meaningfully contest the DPHO's findings that Mr. Nora failed to properly teach it. Mr. Nora believed that simple repetition of words taught a student how to read. Tr. 1264. The District does not object to the DPHO's factual finding that Mr. Nora had "no independent memory of Student's de-coding skills or her learning how to sound out words" using Orton-Gillingham. *See* Tr. 0306; 0340. Nor does the District meaningfully contest the DPHO's finding that Mr. Nora's "lack of training and experience, as well as his lack of understanding regarding both the importance of de-coding, Student's struggles with de-coding, and dyslexia as a diagnosis, detrimentally affected his ability to teach" Orton-Gillingham.[10] *See* Tr. 0306. Though Mr. Nora taught Student using Read Naturally and Orton-Gillingham, the District points to no record evidence showing that he taught those

---

[10] The District fills its Reply with praise such as "Mr. Nora's irrepressible enthusiasm for teaching his special[-]education students to read came through in his testimony." [Doc. 31] at 6. The District then recounts his teaching methods. *See id.* at 6–8. The District fails to connect these arguments to the DPHO's findings. These arguments do not, for example, suggest that Mr. Nora remembered Student learning to decode or that his one week of training in Orton-Gillingham adequately prepared him to teach it. Nor does the District explain how Mr. Nora understood the importance of decoding or how to properly teach students suspected of dyslexia. *See* Tr. 0306.

programs *correctly*—despite the DPHO's finding that he did not do so.  *See id.*  Simply recounting Mr. Nora's teaching methods, [Doc. 31] at 5–8, does not assist the Court in reviewing the DPHO's factual findings that his methods were not calculated to enable Student to succeed. After review of the record, and accepting these factual findings as prima facie correct, the Court does not find that Mr. Nora's teaching was reasonably calculated to improve Student's reading or that he provided Student with proper specialized instruction.

A preponderance of the evidence shows that Student failed to make appropriate progress in reading in fourth grade.  Mr. Nora testified that as of the winter of fourth grade, Student read at a 3.0 level.  *See* Tr. 1261.  Yet, the DPHO found, and the District does not meaningfully contest, that this score overestimated Student's reading level because Mr. Nora based his assessment on Read Naturally's hot reads—the reading technique that focuses on memorization of words rather than decoding.  Tr. 0307–08.  Student's general-education fourth-grade teacher, Ms. Bolin, confirmed that Student could not read grade-level material independently.  Tr. 0309, 1505.  Student sometimes read at a 3.0 level during fourth grade and, at best, could read at a 3.8 level.  *See* Tr. 1638.  Based on her PARCC[11] scores, Student failed to meet expectations for English in fourth grade.  Tr. 1470.  A preponderance of the evidence indicates that Student read well below her grade level in fourth grade.

The District argues that by the end of fourth grade, Student had made such significant progress that she lost her eligibility for special-education services.  [Doc. 26] at 3, 5, 17.  It cites a Diagnostic Evaluation of Student taken by Carol Roark near the end of fourth grade.  *See*

---

[11] The Partnership for Assessment of Readiness for College and Career Test, or PARCC Test, is a collection of standardized tests administered to public-school students each year.  April Maguire, *What Is the PARCC Test? Everything You Need to Know*, CollegeVine (Jan. 26, 2019), https://blog.collegevine.com/what-is-the-parcc-test-everything-you-need-to-know/.

Tr. 0986–0999.  In this evaluation, Student took several tests on various subjects, from cognition to reading to math.  *See id.*  One test in particular—the Kaufman Test of Educational Achievement—is relevant here.  According to the Kaufman Test, Student received an "average" score in reading.  Tr. 0994.  She nonetheless scored in the nineteenth percentile for reading.  *Id.* She received a "below average" score in written language, scoring in the twelfth percentile.  *Id.* On another test, the Word Identification and Spelling Test ("WIST"), "designed to assess word identification and spelling abilities in children," Student scored no higher than the ninth percentile in word identification, spelling, literacy ability, and sound-symbol knowledge. Tr. 0996.  Based on these evaluations, Ms. Roark determined that Student "does NOT meet the eligibility requirements for special education services" and "does NOT demonstrate a severe discrepancy in any area."  Tr. 0999.  The District argues that Student must have made appropriate progress if Ms. Roark determined that she no longer needed special-education services.  *See* [Doc. 26] at 3, 5, 17.

The DPHO was unconvinced.  Though Student technically scored in the average range for reading, she scored in only the nineteenth percentile.  Tr. 0994.  She scored below average in written language, reading fluency, orthographic processing, letter and word recognition, spelling, and decoding fluency.  *Id.*  When questioned about these low scores, Ms. Roark testified that Student simply read slowly.  *See* Tr. 1800.  Ms. Roark also confirmed that the author of the Kaufman Test would have found that Student had a specific learning disability in many areas, including decoding fluency, written expression, letter and word recognition, and spelling. Tr. 1846.  Yet, the District did not use the author's standards for finding a learning disability, instead using a different standard developed in New Mexico.  Tr. 1845–46.  Near the time of this

evaluation, in the spring of 2018, the District conducted a review of existing evaluation data ("REED") and found that Student scored moderately below or seriously below grade level in language arts. Tr. 1756, 1778; *see* Tr. 0400–01.

The Court agrees with the DPHO that Student did not make appropriate progress in fourth grade, the Kaufman Test results notwithstanding. The District simply argues in a conclusory fashion that according to the evaluation, Student had made sufficient progress such that she no longer had a learning disability. *See* [Doc. 26] at 17. It responds to none of the DPHO's concerns about the test results. As noted above, significant evidence outside the Kaufman Test indicated that Student read and spelled well below her grade level. Student's raw scores and percentile scores in the Kaufman Test, though sometimes considered average, were low. Tr. 0319. Though the District believed that Student no longer had a learning disability, the Kaufman Test's own author would have disagreed with the District. Tr. 1846. Other tests in the evaluation, such as the WIST, showed that Student was "poor" or "below average" in many important areas of reading, writing, and spelling. *See* Tr. 0996. The REED results showed that Student scored well below grade level in the language arts. Tr. 1756, 1778. Though the Kaufman Test results indicate that Student had made some progress, these results are dwarfed by numerous other pieces of evidence in the record. Finally, as detailed below, Student's progress in fifth grade regressed from the results seen in the Kaufman Test.

For the foregoing reasons, the Court finds that Student did not make appropriate progress during fourth grade. She failed to make appropriate progress under her third grade IEP, and her largely identical fourth-grade IEP did not enable her to make appropriate progress. Because the District developed a fourth-grade IEP very similar to the ineffective third-grade IEP, the

fourth-grade IEP was not reasonably calculated to enable Student to make appropriate progress. *See Thompson R2-J Sch. Dist.*, 540 F.3d at 1153; *O'Toole*, 144 F.3d at 702. Moreover, the failure to properly teach Student reading using programs such as Orton-Gillingham denied her the specialized instruction necessary to achieve a FAPE.

### 3. Fifth Grade

Progress reports at the start of fifth grade belie the District's suggestion that Student no longer needed special education. On the first day of fifth grade, assessments showed that Student read at a 3.1 level, the eighth percentile, requiring "Urgent Intervention."[12] Tr. 0838. Ms. Wines, Student's special-education fifth-grade teacher, testified that she believed in October of fifth grade that Student read at a beginning- or mid-fourth-grade level—below the 5.0 level one would expect of a student who recently began fifth grade. *See* Tr. 0312, 1413–14. The DPHO assigned little weight to her assessment of Student, however, because she acted defensively at the hearing. Tr. 0312. The Court gives due weight to the credibility judgments of the DPHO and gives little weight to Ms. Wines' anecdotal statement that Student had progressed to a 4.5-level reader shortly after assessments placed her at a 3.1 level. *Cf. O'Toole*, 144 F.3d at 699 (stating that courts generally defer to a hearing officer's credibility determinations).

---

[12] The District argued for the first time at oral argument that the Court should not consider this evidence because the assessments occurred during fifth grade—outside the statutory review period of July 24, 2016 through July 24, 2018. The Court may consider this evidence, just as the DPHO did. First, Parent alleged that the District violated the IDEA "[d]uring the statutory period . . . *and continuing*" thereafter. Tr. 0021 (emphasis added). Student's reading level at the beginning of fifth grade shows that she had not made appropriate progress, even continuing after the statutory period. Second, the Court may consider this evidence because the District contests whether Student made sufficient academic progress during fourth grade; this evidence tends to show that she did not. Third, the District waived any argument against consideration of this evidence by (1) failing to make this argument in its briefing, and (2) failing to object to the DPHO's factual finding incorporating this evidence, *see* Tr. 0314 (finding #66).

Despite Roark's April 2018 evaluation, Student remained multiple grade levels behind her peers in reading.

Rather than enabling Student to make appropriate progress, Student's IEP for fifth grade decreased her reading and writing goals. The fourth-grade IEP recommended that Student accurately read 80% of a 3.5-level text (a text below her grade level). Tr. 0481. Yet, despite making insufficient progress in fourth grade (as detailed above), Student's fifth-grade IEP lowered these expectations, recommending that Student accurately read *70%* of *any* text. *See* Tr. 0518. Similarly, though Student's fourth-grade IEP recommended that she write summaries of assigned passages with 80% accuracy, her fifth-grade IEP reduced that expectation to 70% accuracy. *See* Tr. 0485, 0520. Mr. Nora testified that he did "not have an answer for" why the IEP reduced her expectations. Tr. 1300. Though her previous IEP failed to enable Student to make appropriate progress, the District responded by reducing her goals for fifth grade.

The District failed to give Student the proper amount of reading instruction in fifth grade, in violation of the IEP. Student's fifth-grade IEP recommended that she receive 300 minutes per week of reading instruction in a special-education setting. Tr. 0524. The IEP specified that the District should provide this instruction in individual and group settings. *Id.* Similarly, the IEP recommended that Student receive 150 minutes per week of written-language instruction in a special-education setting, again with both group and individual instruction. *Id.* Yet, Ms. Wines testified that Student did not receive this instruction except "on occasion, when needed." Tr. 1374–75. Typically, Student received instruction in a general-education setting, not special education. *Id.*

The District argues that Student received 300 and 150 minutes of reading and writing instruction per week, respectively, [Doc. 31] at 9, but the testimony cited does not support this assertion, *see* Tr. 1378. Though Ms. Wines testified that Student effectively received the required minutes of instruction in a *general*-education setting, Tr. 1445–47, the general-education classroom only spends "a little [time] every week" on important reading programs like Orton-Gillingham, Tr. 2114. Moreover, though Ms. Wines testified that she thought Student received the correct minutes of instruction under her IEP by receiving instruction in the general-education classroom, Tr. 1445–47, the DPHO gave Ms. Wines' testimony little weight because she "was exceptionally defensive in tone and content" at the administrative hearing, *see* Tr. 0312. The Court accepts the credibility judgments of the DPHO. *See Fort Zumwalt Sch. Dist.*, 119 F.3d at 610. The Court finds that by failing to give Student the requisite minutes of special-education reading and writing instruction, the District failed to implement Student's fifth-grade IEP. The failure to follow the IEP denied Student the opportunity to receive specialized instruction, including in Orton-Gillingham, and denied her a FAPE.[13] *See R.E. v. N.Y. City Dep't of Educ.*, 694 F.3d 167, 187 n.3 (2d Cir. 2012); *Bd. of Educ. of Albuquerque Pub. Schs. v. Maez*, No. 16-cv-1082 WJ/WPL, 2017 WL 3278945, at *4 (D.N.M. Aug. 1, 2017).

The District's failure to craft an IEP reasonably calculated to enable Student to make progress, and its failure to follow the parts of the IEP that required it to give Student specialized

---

[13] The District argues that Student received the proper instruction because Read Naturally and Orton-Gillingham are scientifically based. [Doc. 26] at 15–16; [Doc. 31] at 3. Even though the District used scientifically based programs to teach Student, because the Court agrees with the DPHO that Student's teachers failed to properly teach them and that Student received an insufficient amount of special-education instruction per week in them, the ineffective use of Read Naturally and Orton-Gillingham still denied Student a FAPE.

instruction, caused Student's progress to suffer. Student's fifth-grade homeroom teacher testified that Student's spelling "is nowhere near fifth-grade level." Tr. 2013. Student still struggles with word analysis. Tr. 0340. Coupled with Student's low reading and writing scores obtained in the beginning of the school year, a preponderance of the evidence suggests the District denied Student a FAPE.[14]

The District repeatedly argues that Student's Istation scores show that she has not been denied a FAPE because she made progress from third through fifth grade. *See, e.g.*, [Doc. 26] at 5. Istation is an interactive assessment that tests students on their reading skills. [Doc. 26] at 15. Student's Istation scores—which showed that Student had made more progress than other assessments showed—partially justified Ms. Roark's conclusion in the Diagnostic Evaluation that she no longer required specialized services. *See* Tr. 0988. According to Istation scores in fifth grade, Student read at a 6.1 level—above her grade level. *See* [Doc. 22] at 4.

The Court assigns little, if any, weight to Student's Istation scores. The DPHO found that the District failed to explain the significance of Istation scores, failed to explain how Istation measured academic progress, and failed to explain Istation to Parent before offering an IEP. *See* Tr. 0306–07, 0315, 0317–18, 0322–23. The DPHO concluded:

> After three days of testimony and reviewing a large number of school records . . .
> [I] conclude, without question, that the District relies too often on vague

---

[14] The District contends that the test results documented in the IEP developed at the end of fifth grade show that Student has made progress. [Doc. 26] at 3, 6, 19. As measured by Istation, Student read at or above her grade level. *See* [Doc. 22] at 3–4. Yet, as explained below, the Court assigns little weight to her Istation scores. Other scores on her IEP—such as her 2018 PARCC results—suggest that Student had not yet completely met her reading targets. *See id.* at 3. Though the director of student support services, Ms. Carlyn Hancock, testified that Student had made progress, Tr. 2035–36, it is unclear to what school year she refers, and even assuming Student has made progress, that testimony does not answer the questions of whether Student had made appropriate progress under the circumstances or whether her IEP was reasonably calculated to enable her to do so. Even considering the IEP and Ms. Hancock's testimony, for the above reasons the Court finds that a preponderance of the evidence shows that Student had not made appropriate progress under the circumstances.

references to Istation scores, when school authorities and personnel were frequently unable to explain . . . what Istation scores represent and what they can and cannot measure. . . . I have heard nothing to convince me—even close—that Istation is intended to measure or has been validated to measure whether Student is able to read fluently or is progressing in her ability to de-code or indeed to measure anything much else related to her special[-]education needs.

Tr. 0335–36. The District does not meaningfully challenge this factual finding. After reviewing the record, the Court agrees with the DPHO. At most, the District describes Istation at a high level of generality. *See* [Doc. 26] at 15. It does not explain how Istation reliably measures Student's progress or how her Istation scores show that she has made appropriate progress under the circumstances. To the extent that her Istation scores could indicate that Student has made progress, the Court rejects them as unsupported by record evidence showing their efficacy in measuring Student's progress in reading and writing.

Finally, the District argues that the DPHO failed to give it the proper deference in developing Student's IEP. [Doc. 26] at 12, 18–19. It argues, "Here, the DPHO second-guessed the judgment of educational professionals who evaluated and provided instructional services to Student and agreed with the Parent who disagreed with the content or the methodology chosen by the School District to implement the educational services . . . ." *Id.* at 18. The Court sees it differently. The DPHO did not disagree with the District on "philosophical" grounds. *Id.* at 19. Rather, she found that the IEPs failed to correct years of substandard progress and that, even though the District chose programs like Orton-Gillingham that could help Student, it failed to properly teach them. *See* Tr. 0341 (finding that the District failed to teach Orton-Gillingham "with fidelity"). The DPHO found that many of the justifications for Student's IEPs "[were] *ad hoc* and anecdotal." Tr. 0340. These conclusions take issue not with the methodologies chosen

by the District but its implementation of them and its failure to justify continued use of certain methodologies that had not enabled Student to make appropriate progress.

For the above reasons, the Court finds by a preponderance of the evidence that the District failed to offer Student IEPs in her fourth- and fifth-grade years reasonably calculated to enable her to make progress appropriate under the circumstances. Despite being on notice that Student was not progressing at an acceptable pace, the District offered IEPs largely the same as—and in some instances, less ambitious than—IEPs that did not enable Student to make appropriate progress previously. Additionally, the District failed to follow the parts of the IEP giving Student specialized instruction. The District denied Student a FAPE.

**C.    The record evidence does not establish that Student's absences prevented her from making appropriate progress.**

The District argues that even if its IEPs were not reasonably calculated to enable Student to make appropriate progress, Student could not have made appropriate progress because she failed to attend school consistently. [Doc. 26] at 20–22. Student missed school 34 times in fourth grade and 21 times in third grade. Tr. 0987. She missed at least eight days in fifth grade. Tr. 2111. In addition to her absences, Student was tardy 55 times in fourth grade and 49 times in third grade. Tr. 0987. Ms. Roark concluded that "[Student] has a remarkable history for days absent and tardies throughout her school history. Thereby it is difficult to eliminate the possibility that any learning difficulties she may demonstrate are a direct result of lack of instruction due to [Student] being absent from school." Tr. 0999. The District argues that "the DPHO failed to require the Parent to meet her burden and did not consider and/or give due

weight to the School District's argument that Student's attendance issues contributed to any deficiencies in Student's progress." [Doc. 26] at 22.

The DPHO correctly found that insufficient evidence linked Student's performance to her absences and tardies. The District does not meaningfully contest the DPHO's findings here. The DPHO found that, for fourth grade, Mr. Nora could not understandably explain how he concluded that Student's performance suffered due to her absences. Tr. 0309. The Court agrees. Mr. Nora testified that aside from her Istation scores and unexplained "informal" data, he had no data to support the assertion that Student regressed after being absent. Tr. 1302–03. As noted above, the Court assigns little weight to her Istation scores because the District failed to explain how they measure progress. When asked how he concluded that Student regressed due to absences, as opposed to her simply misunderstanding the material, Mr. Nora testified that he could not "give [counsel] an answer for that . . . all I know is that she was ready to move on."[15] Tr. 1304. Though another teacher testified that Student's reading ability would regress with each absence, the DPHO assigned little weight to this testimony because the teacher's "demeanor and tone" did not reflect a clearer and more current memory of Student than other teachers. *See* Tr. 0311.

As noted above, Ms. Roark found in her evaluation that it "is difficult to eliminate the possibility that any learning difficulties . . . are . . . due to [Student's] being absent from school." Tr. 0999. Yet, the DPHO needed not eliminate the possibility that absences caused Student's lack of progress; it needed only find that a preponderance of the evidence showed that the

---

[15] Additionally, as noted above, the DPHO assigned Mr. Nora's assessments of Student little weight because he did not fully understand Student's disability or how to properly teach Orton-Gillingham. Tr. 0306. The District fails to meaningfully contest these factual findings. To the extent that Mr. Nora's testimony shows that Student's absences could have affected her progress, the Court, like the DPHO, assigns this testimony little weight.

District denied her a FAPE. Moreover, neither Ms. Roark nor other District personnel could identify what instruction Student missed while absent or why that instruction mattered. *See* Tr. 1811.

Aside from general statements that Student's absences affected her performance, her teachers pointed to insufficient evidence suggesting that her absences caused Student's performance issues. The Court does not know what instruction Student missed or the importance of that instruction. *See* Tr. 0320; *see also L.J. ex rel. N.N.J. v. Sch. Bd. of Broward Cty.*, 927 F.3d 1203, 1216–17 (11th Cir. 2019) ("The extent of the shortfalls in L.J.'s speech and occupational-therapy instructional hours, for example, was relatively minor after factoring out the missed sessions attributable to L.J.'s absences."). The Court does not find that the District's general references to Student's absences call into question the significant evidence suggesting that the District failed to provide her with the proper reading and writing instruction.

Finally, the Tenth Circuit has not held that a student's behavioral issues or absences may excuse a schools' IDEA violation. The Tenth Circuit suggested in *Garcia v. Board of Education of Albuquerque Public Schools* that if a student's poor attitude would have prevented her from receiving an educational benefit, then the school might not be liable for her educational deficits. 520 F.3d at 1127. The District extrapolates from *Garcia* a general rule that when a student takes actions that could cause her progress to suffer—such as a failure to attend school—the school cannot be held liable for her lack of progress. [Doc. 26] at 20–22. The District misrepresents *Garcia*. *Garcia*'s discussion about whether a court may consider the effect of a student's own actions on her education is dicta clearly labeled as such. *See* 520 F.3d at 1127 (declining to rule

that the student's actions prevented her from receiving a FAPE). The Court does not find that Student's absences prevented her from receiving a FAPE.

**D.     The DPHO properly awarded compensatory education for the deprivation of a FAPE during fourth and fifth grade.**

The District argues that the DPHO should not have awarded Student compensatory education for fourth and fifth grade because (1) Student had progressed to the point where she no longer needed special education, and (2) the DPHO failed to conduct a fact-specific inquiry detailing why Student should receive compensatory education for an entire year. [Doc. 26] at 24–25. The Court rejects each argument.

The district court "shall grant such relief as [it] determines is appropriate" to compensate a student for lost educational progress. § 1415(i)(2)(C)(iii). "[T]he plain language of [the] IDEA accords district courts broad discretion in determining relief for successful IDEA claims . . . ." *Garcia*, 520 F.3d at 1128; *see Sch. Comm. of Burlington v. Dep't of Educ. of Mass.*, 471 U.S. 359, 369 (1985). "Compensatory education . . . is not defined in the IDEA and is a judicially created remedy. It is intended . . . 'to place disabled children in the same position they would have occupied but for the school district's violations of IDEA.'" *Ferren C. v. Sch. Dist. of Phila.*, 612 F.3d 712, 717–18 (3d Cir. 2010) (quoting *Reid ex rel. Reid v. Dist. of Columbia*, 401 F.3d 516, 518 (D.C. Cir. 2005)). A court's award of compensatory education must be "'appropriate' in light of the purpose[s] of the [IDEA]." *Burlington*, 471 U.S. at 369. The IDEA has four purposes: (1) provide all disabled students with a FAPE emphasizing services designed to meet their unique needs, (2) assist states with implementing a system of early intervention services for infants and toddlers with disabilities, (3) ensure that educators and

parents have the tools necessary to improve disabled children's educational progress, and (4) ensure the effectiveness of efforts to educate children with disabilities. *See* § 1400(d)(1)–(4); *Garcia*, 520 F.3d at 1129. Before awarding compensatory education, the Court must engage in a "fact-specific inquiry" explaining why the relief would compensate the student. *Reid*, 401 F.3d at 524.

The DPHO awarded three types of compensatory education: (1) the District must keep Student in special education through sixth grade; (2) Student must receive one-on-one reading, writing, and spelling instruction with a licensed special-education teacher trained in Orton-Gillingham or a similar program; and (3) Student must receive 300 minutes per week of specialized instruction in reading and 150 minutes per week in writing. Tr. 0345–46. Based on the District's failure to offer an IEP that enables Student to make appropriate progress in reading, writing, and spelling, the Court finds that these remedies serve the purposes of providing Student with a FAPE and increasing the effectiveness of attempts to educate her.

The Court rejects the District's argument that the DPHO should not have awarded compensatory education because Student had progressed to the point where she no longer needed special education. As discussed above, a preponderance of the evidence shows that she had not done so. The Court does not agree that the DPHO failed to conduct a fact-specific inquiry showing why Student needed a full year of compensatory education. The Court and the DPHO have explained in painstaking detail why Student's fourth- and fifth-grade IEPs were not reasonably calculated to enable her to make appropriate progress. The District's failure to follow the IEPs caused her to miss important reading and writing instruction, such as Orton-Gillingham. The Court and the DPHO have shown that Student failed to receive proper individualized

instruction throughout her fourth- and fifth-grade years, including by failing to receive the full 300 and 150 minutes of special-education instruction per week in reading and writing, respectively. The DPHO did not discuss her reasoning for ordering one year of compensatory education versus, for example, six months of compensatory education. Yet, the District cites no authority suggesting that the DPHO must engage in that type of detailed analysis. The fact-specific inquiry outlined above adequately explains why the DPHO chose to award this relief.

**E.** **The DPHO properly ordered the District to provide an independent assistive technology evaluation, and the May 2019 assistive technology evaluation is irrelevant to the relief ordered by the DPHO.**

The DPHO found that the District violated the IDEA by failing to evaluate whether Student required audio versions of assigned text to make appropriate progress. Tr. 0343. The DPHO ordered the District to give Student an independent assistive technology evaluation and provide to Student all services and equipment recommended by this independent evaluation. Tr. 0346. The DPHO then ordered the District to give Student an independent evaluation to determine whether she should receive audio books for many of her textbooks. *Id.* The District advances two arguments against this relief. First, it argues that Parent never requested in the administrative proceedings that the DPHO order an assistive technology evaluation. [Doc. 26] at 3–4; [Doc. 31] at 12. Second, it argues that it conducted its own assistive technology evaluation of Student in May of 2019 (after the DPHO issued its decision), and this evaluation recommended that Student did not need assistive technology. [Doc. 26] at 4. The District does not contest the finding that it violated the IDEA by failing to evaluate Student's eligibility for assistive technology. *See* Tr. 0343. The Court rejects each argument.

First, in her complaint in the administrative proceedings, Parent requested that the DPHO give Student an assistive technology evaluation. *See* Tr. 0022; Tr. 0026 ("The [District] should immediately provide [Student] with access to audio books at school and at home, providing all necessary equipment, infrastructure[,] and training for [Student] to have access to audio books in both settings . . . ."). Second, though the May 2019 assistive technology evaluation recommended that Student receive no assistive technology, *see* [Doc. 22] at 29–28, this evaluation was not the independent evaluation ordered by the DPHO, *see* [Doc. 31] at 12. That the District's own evaluation recommended that Student receive no assistive technology is irrelevant to the District's compliance with the DPHO's order: The DPHO ordered the District to provide all assistive technology recommended by an *independent* assistive technology evaluation. *See* Tr. 0346. After the District provides an independent evaluation, it must, pursuant to the DPHO's order, provide any recommended services to Student.[16]

At oral argument, counsel for the District stated that the District had attempted to schedule an independent assistive technology evaluation, but Parent had not responded to this attempt. Parent's counsel suggested at oral argument that she did not know that the District had attempted to schedule an independent evaluation. Under § 1415(i)(2)(C)(ii), the Court permitted the District to file on the record the letter it sent to Parent memorializing this attempt. *See* [Doc. 38] at 3. The Court is troubled that Parent would not respond to the District's letter. Parent must respond to the District's attempt to arrange an independent evaluation or notify the

---

[16] In its Reply, the District seems to argue that Student already has assistive technology at home in the form of computers, tablets, and access to Google School/Classroom. [Doc. 31] at 12. The District fails to argue how access to this technology affects the potential provision of audio books after the independent evaluation. The District "has audio versions of textbooks," *id.*, and if the independent evaluation recommends that Student receive those textbooks, the District must provide them pursuant to the DPHO's order.

District that she no longer wishes to arrange the independent evaluation on Student's behalf. The District must forward the letter in [Doc. 38] and any other attempt to schedule an independent evaluation to Parent's counsel.

**F.     The Court will deny the District's request to submit any other additional evidence and/or hold an evidentiary hearing.**

In its Reply, the District requested that the Court hold an evidentiary hearing to allow it to present the fifth-grade IEP and the May 2019 assistive technology evaluation report, among other unidentified evidence. [Doc. 31] at 12. At oral argument, the District requested that the Court consider more additional evidence: a packet about Student's academic progress since fifth grade, a doctor's testimony that Student is currently on target to pass seventh grade, an IEP addendum, and testimony from Student's teachers.

The IDEA provides that a court "*shall* hear additional evidence at the request of a party." § 1415(i)(2)(C)(ii) (emphasis added). Despite this seemingly mandatory language, "[t]he Tenth Circuit . . . has clarified that a district court is actually not required to consider all such evidence." *Boutelle v. Bd. of Educ. of Las Cruces Pub. Schs.*, No. 17-cv-1232 GJF/SMV, 2019 WL 1767404, at *2 (D.N.M. Apr. 22, 2019). Rather, the Tenth Circuit reviews a district court's decision to refuse to consider additional evidence for abuse of discretion. *Miller ex rel. S.M. v. Bd. of Educ. of Albuquerque Pub. Schs.*, 565 F.3d 1232, 1240–41 (10th Cir. 2009). If the district court declines to hear additional evidence that was not "*relevant* to the *issue properly before the district court*," then the court has not abused its discretion. *Id.* at 1241. Though a district court may consider evidence outside the record below, "'such evidence is merely supplemental to the

administrative record[,]' and federal court proceedings 'must maintain the character of review and not rise to the level of a de novo trial.'" *Id.* (quoting *L.B.*, 379 F.3d at 974).

The Court declines to permit the District to present the additional evidence suggested at oral argument. First, the District did not request in its Motion that the Court consider the packet about Student's progress, the doctor's testimony, the IEP addendum, or her teachers' testimony. It requested to present additional evidence "including, but not limited to," the April 2019 IEP and the May 2019 assistive technology evaluation for the first time in its Reply. [Doc. 31] at 12. The District did not specify which other additional evidence—such as the packet—it wished to present. The District waived this request to hear other additional evidence by specifying the entire panoply of evidence it wished to present for the first time at oral argument. Even if the Court construed the "including, but not limited to" language as requesting that the Court consider the packet, doctor's testimony, IEP addendum, and teacher's testimony—which it does not—the District further waived this request by failing to raise it in until its Reply.

Second, the District failed to show that this additional evidence would be relevant to an issue properly before the Court. Apart from the doctor's testimony, defense counsel simply stated at oral argument that she wished to present additional evidence, without explaining what that evidence would show or how it would rebut Parent's arguments. Without this explanation, the Court does not believe that additional evidence would help it resolve the instant dispute.

Finally, the Court will not hold an evidentiary hearing to allow the District to present any additional evidence because such a drastic step would effectively rise to the level of a de novo trial. *See Miller*, 565 F.3d at 1241. For the above reasons, the Court denies the District's request

made at oral argument to present additional evidence (except the District's letter to Parent) and denies the District's request that the Court hold an evidentiary hearing.

## CONCLUSION

**IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED** that the District's request that the Court consider additional evidence, including the April 12, 2019 IEP; May 23, 2019 assistive technology evaluation; and the letter from the District to Parent concerning the scheduling of an independent assistive technology evaluation, is **GRANTED**.

**IT IS FURTHER ORDERED** that the District's request that the Court consider any other additional evidence and/or hold an evidentiary hearing is **DENIED**.

**IT IS FURTHER ORDERED** that the District's factual and legal objections to the DPHO's Memorandum Decision and Order are **OVERRULED**, the relief requested in the Amended Brief in Chief [Doc. 26] is **DENIED**, and the DPHO's decision is **AFFIRMED**. The Court will enter a separate order requiring the parties to submit a proposed briefing schedule for any issues related to attorney's fees.

**IT IS SO ORDERED.**

_____
**STEPHAN M. VIDMAR**
**United States Magistrate Judge**
**Presiding by Consent**